1-1-4, Rodriguez v. United States. Mr. Adler for the appellant. And you've reserved five minutes for rebuttal, I see. Thank you, Your Honor. May it please the court, Andrew Adler from the Federal Defender's Office on behalf of Daniel Rodriguez. When Mr. Rodriguez filed his 2255 motion, he remained in custody on his 37-month revocation sentence. It is undisputed that that sentence was unlawful. It exceeded the statutory maximum by 13 months. There can also be no dispute that that illegal sentence had a direct impact on the 400-month sentence that he's currently serving. We know that because at the sentencing, the judge gave him credit for all of the remaining time that he had in the bank for having over-served in the 1994 case. 37 months of that bank time were used to satisfy the illegal revocation sentence. So had he been legally sentenced in that revocation proceeding, he would have had at least 13 more months in the bank and his 400-month sentence would have been at least 13 months shorter. Mr. Adler, do you agree as a factual matter that the BOP has not given Mr. Rodriguez credit for the period of time that he over-served the felon in possession charge against his 400-month sentence, the more recent sentence? That's correct, Your Honor. And isn't that within the BOP's discretion at this point and not the district court? Your Honor, we're not challenging that here. What we're saying is that whether he gets the credit, even assuming he doesn't get the credit from the BOP, if he gets it from the judge, all of our legal arguments are the same. And despite the unique facts of this case, they are controlled by Garlotte v. Fordyce. He's in custody under that precedent, not Millang v. Cook. And if I could just take a moment to sort of try to reconcile those two. Garlotte is essentially all about getting credit for having over-served an expired sentence. And you get that credit towards the sentence that you are currently serving. And in that case, it was just credit to eligibility for parole. That's what we have here. We have a credit. We have an over-serving of an expired sentence that would then be applied towards the current sentence that he's serving. Can I ask you a question about Garlotte and Millang? Is the distinction, right, what makes Garlotte different, at least in one respect, from Millang, is that in Garlotte, you have the consecutive sentences. Is the animating principle of Garlotte consecutiveness, full stop, or consecutiveness plus shortening of the term? Because that seems potentially, at least in light of what the Fourth Circuit has said, you know, about the 400-month sentence, to matter, right? I don't think anything the Fourth Circuit said matters in that respect, but I think your question is exactly where I was going about Garlotte. This court in Diaz has already told us what the central rationale of Garlotte is. It is the shortening of the sentence, because that is the core purpose of habeas review. That's what Garlotte says. The consecutiveness, I don't even think is necessary. And if you look at Diaz, for example, this court doesn't ask whether they're consecutive or concurrent. It doesn't matter, because there's no custody in that case, because it doesn't affect his current, can't shorten his term, because he's not going to get any credit. And in fact, this court in Diaz cites a Tenth Circuit case called Brown, where it says, even if the state, even where the state and federal sentences are ran consecutively, it doesn't matter, because you're not going to get any credit for the expired state sentence. So I guess the reason I was asking about that, your answer sort of has me now back on my heels, because what I thought you were going to say is, no, no, no, Garlotte is all about consecutiveness, and it has nothing really to do with shortening the sentence. And the reason I asked about the Fourth Circuit decision is that, tell me if I'm wrong about this, if the Fourth Circuit is right about 3585, that offense, that you interpret the term offense to mean conviction and not conduct, doesn't the Fourth Circuit say, you can't kind of like cross-credit time from one offense to another, which the Fourth Circuit takes to mean from one conviction to another, so here you couldn't cross-credit from the 37-month 94 conviction to the 400-month 2017 conviction? Your Honor, we're not disputing any of that. We're not arguing that he banked time from the 94 case that can now be used to, because then, what the Fourth Circuit said, we're not disagreeing with. What we're saying is that, even if he's not going to get any credit from BOP, he can get it from the sentencing judge, and because the judge expressed her clear intent at the sentencing to give him all of the time that he had remaining in the bank, and he would have had at least 13 months more time in the bank had he been legally sentenced in the revocation proceeding. That is from the transcript of his sentencing proceeding. So we're sort of past, I mean, the factual backdrop has shifted here in light of that the BOP misinformed him that he was going to get this credit. We're agreeing he's not going to get that credit, but the judge, the judge can give him that credit. Now, how we go about that ... So, back up. Tell me what the basis is in your view for the credit in the first place. It is the judge exercising her discretion at the sentencing hearing to give him all the credit for all of this time that he had over-served the illegal sentence in the 94 case. So you don't think there's a statutory basis for that credit? You just think that the judge was exercising discretion and saying that that was just the right thing to do? That's correct. Okay. That's correct, Your Honor. But I don't think that changes our legal argument in any way because it's still a credit, and in our view, that is what Garlot is speaking about. Malang, what's going on in Malang is the Supreme Court says it's an habitual offender sentencing enhancement, and the Supreme Court says, look, we very liberally construe the custody requirement, but we have to create an exception for these habitual offender statutes because every jurisdiction has them. People cannot be in perpetual custody for sentences that expire decades earlier just because they can later be used to enhance a sentence. That would read the custody requirement out of the statute. That would open the floodgates. So that floodgates concern, which is driving the exception in Malang, has no application here given the unique facts of this case where we have somebody who has over-served two ... has been in the case. The judge comes along in the later case, in the 2017 case, expresses her clear intent to give him all this credit. Those facts, I would hope, just do not happen. So if the court writes an opinion in this case saying, look, based on the unique facts of this case, which is not an habitual offender sentencing enhancement, the 37-month sentence is in no way a predicate for an enhanced sentence. The unique facts of this case, he's in custody under Garlot. Now as to the consecutive point, we think that these are consecutive sentence in any event. So even if you take a narrow view of Garlot, we still fall under that because as a practical matter, and that is how the Supreme Court looked at it, it said practically speaking are these consecutive sentences? And they are here because he gets the revocation sentence on April 10th, 2018. It's immediately satisfied because of the bank's time. The very next day, April 11th, he starts serving what would become the 400-month sentence. And we know that because the BOP told us that at docket entry 42 pages 8 and 10, it says he immediately began to serve what would become that sentence. So as a practical matter, these are as consecutive as they get. Of what relevance to Garlot's consecutiveness criterion, if any, is 3584? Like do we assume that Garlot is sort of written against the backdrop of 3584? And if so, how do you interpret 3584? Because there seem to be kind of like mixed messages in it. Like there's definitely this piece that says like if silent, then consecutive, right? Easy. But that first sentence, what's the first sentence about like non-discharge time, all of that? Like how does that fit in? Sure, Your Honor. So two answers. First, I don't think 3584 really matters here because what I just said, it's a practical question. It's not a formalistic legal interpretation of the word consecutive. We're not interpreting the word consecutive in a statute here. We're interpreting it in a Supreme Court decision. We have to understand the rationale in which the context, you know, the context. I guess I just wonder like do you think Garlot was written against the backdrop of 3584? I mean, obviously, I don't cite it, but you know, there's this understanding about consecutive sentences. I don't think so, Your Honor. That was a state case that was consecutive state sentences under Mississippi law. It had no reason to talk about federal law. And this goes back to what the rationale is. If you look at footnote five of Garlot, it talks about why this focus on consecutiveness. It matters in that case only because that's what determines whether you get credit towards your eligibility for parole because parole eligibility under Mississippi law was measured against how much time you serve your consecutive aggregate sentence. So that's why it's all the focus on consecutiveness. And I think what the government is trying to do here is isolate that word, say that's all that matters, and then sort of adopt this formalistic, you know, legal interpretation. In any event, under 3584A, the last sentence, as you mentioned, is squarely on point here. It says multiple sentences imposed at separate times run consecutively unless the court orders otherwise. The court did not order otherwise here. That's why BOP told Mr. Rodriguez that his sentences ran consecutively. I have a question about your approach. In your blue brief, you seem to base the argument mainly on Garlot, and I think that's what you've talked about the most here. By the time of your gray brief, it seemed like you were arguing Fox as a separate ground. Which one is it? Well, our principal argument here is Garlot. Fox, I don't even think you need to get to that if you agree with us about Garlot. The only way you think you need to get to Fox is if you think Garlot absolutely requires the sentences to be consecutive and that our In that case, we have an independent argument under Fox v. Kelso, which doesn't depend on consecutiveness, which is just a straight credit situation, and that's what we have here. But I don't think you need to get that if you agree with us. Why are you hesitant to get to Fox? Because Fox, to me, seems at least a little bit closer. Because of the issues that we have, I think, canonically acknowledged about the lack of interpretations of what that holding in the case is. And I think it would be easier for the court to just say, well, we don't have to resolve whether that case has been abrogated or not because this case is just controlled by Garlot. I think that's the easier way to do it. Now, if you want to write an opinion saying it's controlled by Fox, Fox remains good law. We would be fine with that as well. Can I ask you to just to spend a couple of minutes on the recusal issue? Of course. You know, because I suspect, at least I'll want to talk about it with the government as well, so I want to give you your time as well. Is that like an independent ground? Like if we were to conclude that the judge should have recused, is it possible that we just say, hey, look, the judge never should have heard any of this. We're going to remand it to a new judge and they can do this jurisdictional thing afresh. We would have no problem with that, Your Honor. Mr. Rodriguez feels very strongly about that deal. Through a lot of this, he's gotten two illegal sentences. In the revocation proceeding, he's got a judge who has no business, I mean, who in his view is recused, disqualified, who then presides in the 2255. Now he's got the government saying that he can't remedy an illegal sentence because he over-served the first illegal sentence in the same case. And then mixed into all of that, we have Chief Judge Moreno intercepting this letter from BOP, writing this, you know, scathing opposition to this credit that the Ninth Circuit later finds violates his due process rights. I mean, he feels wronged here. He feels aggrieved that the judge presided over this. So if the court wants to say, look, Judge Martinez had no basis under the recusal order or the recusal statute or both from presiding in this 2255 and send it back and reassign it, we would have no problem with that. The only downside to that is delays. It delays the proceedings here. The appeal in this case is a 2020 case. We would respectfully urge, you know, a resolution on the custody issue because we don't want to have to go back, reassign this case to a judge from somewhere else only to be told that, you know, he's not in custody after all. And then we have to file a quorum nobis or something like that. So the timing issue is the only problem I would have with that. Whether, you know, whether it's an independent jurisdictional issue or not I think is not altogether clear. But either way, we would be fine with that approach. Does the fact that we said in the, I can't talk, it's Friday. Does the fact that we said that the plain wording in the 1994 recusal order which Rodriguez seeks to enforce demonstrates that the order applied only to the proceeding for which it was issued, the fact that we've already said that block you or even us from coming to a different conclusion today? No, Your Honor. I believe, if I'm not mistaken, I think what you're reading from may be his direct appeal in the 2017 case. That case is a different criminal case number. The, this case arises out of the 1994 case in which the recusal order was entered. So I believe what this court said in the direct appeal in the 2017 cases, it's limited only to the 94 criminal case. And that is what we are in now. The 2255 now is an outgrowth of that 94 case because he is challenging. Well, although, is it different to be that case versus an outgrowth of that case? Well, what the recusal, well, it's an outgrowth, but it's docketed in the 94 case. The 2255 is docketed there. The order denying it is docketed there. And the judgment we're challenging is entered is the 94 judgment. It's all in that same case. And I believe in our reply brief we cited some authorities explaining how 2255 is really just a, it's just a product, it's just part of the underlying criminal case. So I don't think that anything the court said in that direct appeal from the 2017 case in any way sort of blocks the court from, from, you know, agreeing with us about the language of the recusal order here. And in any event, we have this sort of independent argument under 455A regardless of the language of the recusal order that Judge Martinez, you know, had no business presiding over this proceeding. One more question. If it weren't, my understanding of the record is that if, if it weren't for be, how can these be consecutive sentences if he would have been free but for pretrial detention? I think it's, I think it's just the opposite, Your Honor. So from his perspective, he doesn't go anywhere. He is in federal custody from December 2017 to now. He's never gone out, he's never been out of jail. This is not like an habitual offender enhancement situation where you commit a crime, you do your time, and then decades later you're enhanced for that. That's the Malang world and we're not in that. Now, if he did not have any banked time, then the 30, he still would have been serving the 37 month revocation sentence when the 400 month sentence was imposed. Those, so, so in that sense, he's now being penalized for having all the banked time from over serving an illegal sentence and that just would be an inequity. Wasn't, wasn't he, wasn't he, wasn't he being detained as for pretrial detention at that point? So, yes, I was just explaining that if he didn't have any banked time from the first legal sentence, those sentences would have just run up against each other. So the 30, he still would have been doing the 37 months when the 400 month sentence was imposed. So I'm just, I'm just saying that he's effectively being penalized for having over served the first sentence, which just seems wrong. Now, I think what maybe you're asking is, um, between April 11th, when he, the revocation sentence, the revocation sentence is imposed and expires on April 10th, right? April 11th is when he starts doing the time that will be credited towards the 400 month sentence. You're right. The 400 month sentence is not imposed until June of 2019. So there's an over year gap there, but all he's in custody, he's in federal custody that entire time and he's getting credit under 3585B for that period of time. So, you know, I think the government wants to say, well, you know, technically the sentence didn't start until after it was imposed, but from our percent, you know, as a practical matter, which is all that Garlot cares about, these sentences are running back to back because he's all the credit that he's getting from that year period is being credited towards the 400 month sentence. So they're running back to back in every practical way that matters. Thank you. Thank you. Will you give your full five minutes for rebuttal? Ms. Vickery. May it please the court, Sophia Vickery for the United States. On the custody issue, I wanted to start by clarifying three key dates that I think are important to understanding Mr. Rodriguez's status in custody. The first is December 7th, 2017. On that date, he was arrested for two reasons, for violating supervised release in the 1994 case and on new federal charges in the 2017 case. The second date is April 10th, 2018. On that date, he was sentenced to 37 months for the violation of supervised release. And that same day, the credits expired. I'm sorry, upon application of credits, that sentence expired. The third date is June 13th, 2019. And on that date, he was sentenced to 400 months in the 2017 case. He's currently in custody on the 400 month sentence in the 2017 case and not on any other. I wanted to clarify one other point that just came up, which is about the credits for pretrial detention. The BOP actually gave Mr. Rodriguez credits towards the 2017 case, starting on December 7th, 2017, when he was arrested for charges in that case. So the credits that he received extended from December 7th, 2017 to June 13th, 2019. And that was for his pretrial detention in the 2017 case. That's reflected in a BOP computation sheet that's in the 2241 in the Fourth Circuit. This court could take judicial notice of that computation sheet, or I could provide it after argument as well. Turning to, I think there are two theories that were just discussed as to why Mr. Rodriguez might still be in custody on an expired sentence. The first is about the potential impact on the 400 month sentence that Judge Ungara gave him in the 2017 case. The government has a different view about what happened in that sentence. The district court judge did not give him one-to-one credits in the way that Mr. Rodriguez is asserting. But even assuming that there was an impact there, a straightforward application of Belang v. Cook shows that he's not in custody on the 1994 case. A prisoner does not remain in custody on an expired sentence because it is used to enhance a sentence imposed in a subsequent conviction. He would be in custody pursuant to the second conviction there, not the first. But isn't your adversary right that the gist of Garlotte when you read it is just this very pragmatic, practical reading of what custody means? Because at least as I read the plain terms of 2255, I mean you need to be attacking the very sentence under which you were in custody, you know, sort of precisely. But Garlotte seems to sort of shrug its shoulders at that and say, look, if practically speaking these sentences are running consecutively, then Belang doesn't necessarily control and we have a different rule. Well, I think it's it interprets the term in custody specifically about consecutive sentences. And it says that when a prisoner is serving consecutive sentence, it will view those sentences in the aggregate. There's nothing to aggregate in this case because the sentences aren't consecutive. The sentence for 37 months was imposed in 2018 on April 10th. It expired that same day. Then there was a gap of over a year during which he was serving pretrial detention. But that doesn't make the sentences consecutive because one happened later in time than the other. But what about your adversary's point that that just so now he's being penalized for having over served for nearly a decade. If he hadn't, if he didn't have the credits, the pretrial detention wouldn't have, we wouldn't have had this period of pretrial detention. He just would have been serving straightaway true blue sentences the I don't think that's right. Well, he's not being penalized now because in the government's view, the 37 month sentence has no impact. Well, except that you say he doesn't get the benefit of Garlotte because he was in pretrial detention instead of in a real sentence. Right. But because he's not in custody because the 37 month sentence doesn't affect his release date or his sentence in the pretrial detention in the 2017 case. So he was not just serving time in jail for which he didn't receive credit. Instead, the BOP gave him credit starting all the way back in 2017, which would not have been the case if the credits had not applied to expire the 37 month sentence. How does it affect things that it seems the argument, as I understand it, is that he wasn't actually due to have any credit on a statutory basis, that it was just the judge exercising discretion to offer that credit. How does that impact the arguments? So I think that puts it more very squarely in the Malang versus Cook category that this was and it's even more discretionary than a sentencing factor, which is what's discussed in Malang. Also, if you look at the sort of sentencing documents there, the defendant provided two pages from the sentencing transcript and the 28-J letter, and I direct the court to the pages in between those. So 29, 30, 31, as well as the statement of reasons that the district court provided in the 2017 case. And those make clear that the district court believed that a 400 month sentence was appropriate based on a variety of factors, including the defendant's criminal history, the seriousness and social consequences of that crime, which involved providing dangerous substances to approximately 40 percent of federal prisons across the country, and the defendant's inability to understand the impact of that crime. I'd also point out that the 80-month reduction is not a one-for-one with the credits that Mr. Rodriguez had. It's actually fewer, less time than the credits that he had. So that, in addition to the fact the district court can't provide credits in that way under the statute, it shows the district court believed that a 400-month sentence was necessary for Mr. Rodriguez, regardless of how much time he had. Break down that argument for me. What was the difference between the credits that you say he had versus what was offered? So it's slightly imprecise because there's a days-months problem, but the district court gave him about 80 months off of his sentence, and he had slightly more credits, even with the 37-month sentence. It's about maybe a month more. So I think that that shows, though, apart from the fact that the district court wasn't applying a sort of statutory reduction, that the district court believed that 400 months was appropriate, and was taking the fact that he had over-served in the 1994 case into account as a general matter, not in sort of a one-for-one way. And even so, I think this would still be controlled by Malang versus Cook because he's still in custody on the 2017 case, and in fact he's asking for a change in that judgment, which I think is evidence of that fact. How do you differentiate this case from Fox? So there's a couple ways to do that. In our brief, we argue that Fox was abrogated by later Supreme Court case law. It's also a little bit unclear what the facts are in Fox, in the opinion, because it's talking about a misdemeanor sentence that was, and it describes it in a way that it was consecutive potentially to the subsequent sentence. So I think in either respect, this court could distinguish Fox, and this court's subsequent decision in Unger makes very clear that when a defendant is challenging a second sentence, the 2255 should be filed with respect to the second case. So the 2255, the argument he's making to be in custody should be filed with respect to the 2017 case. The defendant has actually filed a 2255, a different 2255, with respect to the 2017 case that the district court denied last month. I'm happy to talk about the recusal issue. Can I ask you just a quick question about Fox? And I may just not be remembering precisely. Was the petitioner in Fox serving consecutive sentences? So it's a little bit unclear in the decision the way that it's described, but it appears that he had like five misdemeanor convictions that delayed like the start date of his subsequent sentence. And so I believe, it doesn't use the word consecutive. The description sounds quite like consecutive. With respect to the recusal order, the plain language of the 1994 recusal orders don't apply to this motion. I'd point the court to its decision in Ari Moody, in which the court held that a similarly worded order applied only to the judges serving at the time of the order. Can I ask you a question? Because I have to confess, I'm sort of hung up on what you call, and I think rightly, the plain language of the 1994 recusal order. It says, it applies for an indefinite period of time in the case of United States versus Daniel Angel Rodriguez, case number 94402CR until completion of this matter and thereafter as may be required to complete unfinished business, right? And haven't we said in bank within the last two years, in Courtney Wild, that 2255 is not a standalone proceeding, but is a further step in the movement's criminal case? Yes, and this court has also said that it is an independent civil action. And how do, well, you cite a case from 1990 in your brief that says that. That's not what the rules governing 2255 say, and it's not what we said within the last two years in Courtney Wild. Yes, I think it's an issue potentially open to interpretation, right? Including the fact that 2255s are sort of docketed both in the underlying criminal case and have, you know, their independent civil docket. I mean, isn't that what makes 2255s a little different from 2254s? 2254s are undoubtedly separate standalone civil actions, collateral attacks, but 2255s are different. This is why we call them motions instead of petitions. They are motions filed in an existing criminal case. So, I mean, it seems to me that the traditional understanding of 2255 embraced by the court and bank suggests that we're still within the 94 case. Well, even so, I think that in R.E. Moody, this court held that the language only applied to judges serving at the time of the order. I think you may have also . . . I guess I don't even really understand that. I mean, like, whatever we said in Moody, how does that affect the plain language of this order? So, it was a similarly worded order, and in R.E. Moody, it recused . . . I think one of the difference was it says active . . . all active and senior judges on the court. This one just says judges. But the court held that the plain language of that recusal order applied only to the judges in the court at the time of the order. So, on the date that it was issued, it only impacted those judges then serving. And I think that that makes sense as an interpretation in this case as well because obviously . . . I think you may have been reading from the order designating a specific judge to hear this case. Obviously, that order cannot exist into eternity for practical reasons. And it also makes sense given the facts and the reasons for the recusal involving the attack on Judge Highsmith that those who were on the court at the time and his colleagues at the time would have been more affected by those facts than someone today. Yeah. I mean, I guess I think I understand how that distinction runs to the 455 argument. I'm not completely convinced that it much matters for just an interpretation of an existing court order. Well, to the extent that the order is unclear, I think it makes sense to interpret it with the background principles of 455 present, which would be the reasons that order was issued. I don't think that it's possible to issue an order, particularly one which designates a specific judge, to apply in a vacuum for all time. A different judge obviously has to hear this 2255 at this point. And the reasons that that order was issued and why perhaps the court thought recusal was necessary in 1994 are quite different than they are today. In addition, the defendant would also need to show that he's entitled to vacatur, which would require a showing of a risk of injustice in this case or other cases and undermining public confidence in the judicial process. Those factors are not present here. There's no indication that Judge Martinez's decision was incorrect or that there's a risk of injustice, particularly given that he has been presiding over the defendant's 2255 motions for some time and also granted the defendant's 2255 in the 1994 case, which is the result which caused all of these credits in the first place. If there are no further questions, the government simply asked the court. Thank you. I'd like to make a couple of quick points about the custody and the recusal issue. On the custody issue, the consecutive sentences in Garlotte matters only because it affected whether he would get credit towards his parole eligibility. That's the only reason why they're talking about it. It's not a standalone requirement. It matters only in that context, and that's why in Diaz the court doesn't even ask. It doesn't even ask if it's consecutive or concurrent, and the facts of that case are unclear about whether it is. The only thing that that is how the custody requirement has been interpreted liberally by the Supreme Court. But if it's the case, as you say, that this is just a matter of the judge taking into account a credit from some past over-serving, isn't that different than really any of the cases that you cited which had specific statutory bases for what was happening? Yes, Your Honor. It is different. The facts of this case are unlike any case that I've seen. They're sui generis. I think that cuts in our favor, though, because there's no floodgates concerns here. This has really never happened before. But as to the point that my co-counsel made about this not being a one-for-one credit, I think that is wrong. The judge gave him 80 months of credit. That's in the sentencing transcript. Right after she gives him 400 months, she says, by the way, it would have been 480 had you not over-served this time. That's a docket entry 633, page 31. We provided it last week to the court in the 28J letter. She had before her in the PSI that we also provided. What the probation officer told her is that he had 2,461 days of dead time, time that he had not gotten credit for. If you do the math, that's about 80 months. So I'm not quite sure where the disparity is there. I mean, there is a months to days problem. But if you divide 2,461 by 30, 31, you get about 80 months. That's what the judge was doing there. So it's really a direct credit. Whether it's the judge doing it or BOP doing it doesn't affect our arguments that he can't possibly be in custody for purposes of the old sentence when the judge is just kind of considering that as one discretionary factor in how long to sentence this brand new crime. We don't view it as a discretionary factor. It's a credit. She is deducting 80 months from the sentence she would have given him. That's what she said. She wasn't at all. There's no statute that even suggests that she ought to do that. It's clear that she's perhaps that's more fair since he over served. Yeah, exactly, Your Honor. But I think that cuts in our favor because this is the clear intent of the sentencing judge. This is the person, not an administrative agency. This is the person who should decide how long Mr. Rodriguez serves time. And she made it very clear what her intent was in this case, whether it's discretionary or not. I mean, I don't really see the relevance to the custody determination in that regard. Because if you view Garlotte as a credit situation where you count the number of days he over served and you credit it towards the current sentence, it's the same. That's exactly what we're saying here. And in fact, it's more compelling here because in Garlotte, it's just eligibility for parole. It's not even like somebody is definitely going to have a shorter time. It's eligibility. It's a potential. So we've certainly satisfied that here. As for the questions about Fox, I think two points. Unger is not clear. Unger is the opposite of clear. And if you want to, it has two conflicting statements in that decision. The government relies on one. We rely on the one that expressly characterizes the holding of Fox in the way that we think should be interpreted, which is to say that he remained in custody on the expired sentence, not that he's in custody on the current sentence that he could then use to collaterally challenge the expired sentence. That's how the government reads it. And by the way, our interpretation is shared by the Supreme Court in Garlotte. That's exactly how the Supreme Court interpreted it in footnote two of the opinion. I think that should be given weight by this court. As for the recusal issues, the designation order, the government doesn't even cite that order in its brief. And I think Your Honor identified why, because the language makes no sense. If you're the completion of all unfinished business for an indefinite period, that makes no sense if it's not going to apply to a 2255 proceeding. That's why Judge Probst from Alabama is presiding over this case for 15 years. And that's why the Ninth Circuit in its decision finds that the recusal language covered Chief Judge Moreno. He said he was still recused 15 years later when he's writing this letter to BOP. As for Moody, we explained in our reply brief, the language of the recusal order in that case is fundamentally different. What's going on in Moody is every individual judge who's on the court at that time is making an independent termination that they should recuse. That is different than what happened here in the 94 case, where the Chief Judge of the Southern District is saying, look, I am deciding as the Chief Judge of this court that every judge in this court is recused. It's a different situation. The language is different. And we also didn't have the sweeping designation order that we had here that we had in Moody that did not exist. And finally, just the last point I'd like to make, as I see my time is up, the court counsel said, you know, if there's any doubts, you know, it should go in their favor. It's just the opposite. Under the recusal statute, this court in Patty and other cases has made very clear, if there's any doubt, you err on the side of recusal, and that's the result we think should apply here. Thank you, Your Honor.